IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

DARRYL A. PACKER, a/k/a          :
DARRYL DENNIS,
                                 :
   Petitioner,
                                 :
v.                                   CIVIL ACTION NO. 06-00665-CG-B
                                 :
WARDEN KENNETH JONES,
                                 :
   Respondent.
                                 :

## REPORT AND RECOMMENDATION

Darryl A. Packer, a state prisoner currently in the custody of Respondent, has petitioned this Court for federal habeas corpus relief pursuant to 28 U.S.C. § 2254. Packer challenges the validity of his 2004 convictions by a jury in the Mobile County, Alabama Circuit Court, for first-degree rape, for which he received a sentence of ninety-nine (99) years imprisonment, and first-degree burglary, for which he received a sentence of ninety-nine (99) years imprisonment, the sentences to run consecutively. (Docs. 5; 11).

This matter is now before the undersigned Magistrate Judge on Petitioner's petition and amendments, Respondent's answer and supplemental answers, briefs, responses, and exhibits filed by the parties, the state court records, various appellate briefs

1

filed by the parties, and opinions and orders of the state appellate courts. Following a careful review of the petition and record, the undersigned finds that an evidentiary hearing is not warranted on the issues.[1] See 28 U.S.C. § 2254(e)(2).

---

[1]Because Petitioner filed his federal habeas petition after April 24, 1996, this case is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA). "AEDPA expressly limits the extent to which hearings are permissible, not merely the extent to which they are required." Kelley v. Sec'y for Dep't of Corrs., 377 F.3d 1317, 1337 (11th Cir. 2004). The legal standard for determining when an evidentiary hearing in a habeas corpus case is allowed is articulated in 28 U.S.C. § 2254(e)(2), which provides:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that–
>
> **(A)** the claim relies on–
>
> **(i)** a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> **(ii)** a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> **(B)** the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Petitioner has failed to establish that an evidentiary hearing is warranted in this case.

<u>FINDINGS OF FACT</u>

The Alabama Court of Criminal Appeals found the facts of this case to be as follows:[2]

> The appellant was convicted of first-degree rape, a violation of § 13A-6-61, Ala. Code 1975, and first-degree burglary, a violation of § 13A-7-6, Ala. Code 1975. The trial court sentenced him to serve consecutive terms of ninety-nine years in prison. The appellant filed a motion for a new trial, which the trial court denied after conducting a hearing. This appeal followed.

---

[2]AEDPA directs that a presumption of correctness be afforded factual findings of state courts, "which may be rebutted only by clear and convincing evidence." <u>Bui v. Haley</u>, 321 F.3d 1304, 1312 (11th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)). "This presumption of correctness applies equally to factual determinations made by state trial and appellate courts." <u>Id.</u> (citing <u>Sumner v. Mata</u>, 449 U.S. 539, 547 (1981)).

At the time of the trial, the victim, Felicia Langford, was dead. At trial, the State introduced statements the victim had made to James Dannelly, the officer who first responded to the scene; T.J. Roberts, the detective who met with the victim at the hospital; the 911 operator; Joseph Milam, the victim's boyfriend; Scott Striplin, the doctor who examined the victim; Shirley Langford, the victim's mother; Dorothy Jones, a volunteer with the Rape Crisis Center; and Ethel Taylor, a nursing assistant who was involved in treating the victim.[3] In those statements, the victim stated that, on the evening of January 30, 1995, she arrived at her apartment complex between 8:30 p.m. and 8:45 p.m.; that she got out of her vehicle and was carrying some packages; that she went upstairs to her apartment, unlocked the door, walked inside, and put down the packages; that, when she turned around, there was an unknown black male in her apartment; that the man then dragged her back to the living room, forced her to lie face down on the floor, unzipped his pants, pulled her pantyhose down to her knees, and made several attempts to penetrate her vagina, but could not; and that the man turned her over, took her pantyhose and shoes off completely, took $9 from her purse, and penetrated her vagina. The State also presented evidence that, in 1996 and 2003, DNA analysis was performed on DNA extracts from a vaginal swab taken from the victim after the rape; that each test yielded a DNA profile that was consistent with a mixture of DNA from the victim and the appellant; that the combined population frequency for the male DNA profile from the vaginal swab was expected to occur in random unrelated individuals at the frequency of approximately 1 in 4,200,000,000 white

---

[3]It appears the appellate court inadvertently omitted the name of Police Officer Lamar Whitten, who also testified at Petitioner's trial, from various parts its analysis.

individuals and 1 in 89,000,000,000 black
individuals. The State also introduced evidence
that semen was found on the victim's skirt; that
DNA analysis indicated that there was a match
between the DNA on the skirt and the appellant's
known DNA sample; and that the probability of
selecting an unrelated random individual from the
population who matched the appellant's sample was
1 in 111,600 white individuals and 1 in 764,500
black individuals.

(Doc. 20, Ex. F at 48-49).

Petitioner was indicted by the Mobile County Grand Jury on
June 27, 2003, and charged with rape and burglary. (Docs. 11;
20, Ex. B at 6). On August 22, 2003, Petitioner entered a plea
of not guilty to the charges, and his jury trial commenced on
March 1, 2004, in the Circuit Court of Mobile County, Alabama,
the Honorable Joseph Johnston presiding. (Docs. 11; 20, Ex. A,
Pt. 1 at 9). Attorneys Joe Carl "Buzz" Jordan and James Byrd
represented Petitioner during trial. On March 5, 2004, the jury
returned a verdict of guilty as to both counts, and on April 8,
2004, the trial court sentenced Petitioner to two consecutive
terms of ninety-nine (99) years imprisonment. (Docs. 11; 20, Ex.
F at 48). On April 16, 2004, Petitioner filed written
notice of appeal to the Alabama Court of Criminal Appeals, and
attorney Glenn Davidson, Esq., was appointed to represent
Petitioner during his appellate proceedings. (Doc. 20, Ex. A,

Pt. 1 at 36).  Petitioner filed a motion for a new trial, on April 28, 2004, which was denied by the trial court on July 28, 2004, after a hearing on the motion. (<u>Id.</u> at 37; Doc. 20, Exs. B at 12, F at 48).  On May 27, 2005, the Alabama Court of Criminal Appeals affirmed Petitioner's convictions by unpublished memorandum opinion. (Doc. 20, Ex. F, pp. 48-80) (Cobb, J., concurring with opinion, at (Doc. 20, Ex. D)).  Petitioner's application for rehearing was overruled on July 8, 2005, and Petitioner's petition for writ of certiorari was denied, on October 14, 2005, by the Alabama Supreme Court. (Docs. 11; 20, Exs. E - H).  On September 21, 2006, Petitioner filed a Rule 32 petition in the Mobile County Circuit Court challenging his convictions.  <u>See</u> (Docs. 5, 11).  Packer's Rule 32 petition is still pending in the trial court.

On October 13, 2006, Petitioner filed the instant petition in this Court setting forth six (6) claims in support of his request for habeas relief. (Docs. 5, 12, 13, 17).  In his second supplemental answer[4], Respondent asserts that Petitioner is not

_____

[4]Respondent's initial answer and first supplemental answer to Petitioner's habeas petition alleged that Packer's petition was subject to dismissal because he has not fully exhausted his remedies in the Alabama state courts. (Docs. 11, 15).  However, Petitioner requested leave to amend his petition to delete those claims which are contained in his Rule 32 petition currently pending in state Court. In his request, Packer stated that he

entitled to relief on the basis of any of these claims. (Doc. 20). Specifically, Respondent alleges that Petitioner's Claims 1, 2, 3 and 6 were raised by Petitioner on direct appeal, but Petitioner has failed to establish that the state court's decision regarding these issues was contrary to federal law or an unreasonable application of the law to the facts of his case. Further, Respondent contends that Claims 4 and 5 were not properly presented on direct appeal and are, therefore, procedurally defaulted and were otherwise denied on the merits in the state courts. This case is ripe for a decision by this Court.

<u>DISCUSSION</u>

Part One: Claims One, Two, Three and Six

A review of the record and pleadings in this action reveals that all except claims 4 and 5 appear to have been appropriately raised in the state courts and denied on the merits. Because claims 1, 2, 3 and 6 have been decided by the state courts on the merits, in order to obtain federal habeas relief on the basis of any of these claims, Packer must show that the state

---

had no intention of pursing his unexhausted claims in a habeas action or in federal court. In view of Packer's acknowledgment, the undersigned granted his request to dismiss his unexhausted claims. (Docs. 12, 13, 14, 18).

courts resolved this claims in a manner contrary to or involving an unreasonable application of federal law as established by United States Supreme Court precedent.    28 U.S.C. § 2254(d) provides that:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Id. Packer filed his habeas petition after the enactment of the AEDPA; therefore, subsection (d) applies to his petition. In Williams v. Taylor, 529 U.S. 362, 412 (2000), Justice O'Connor, writing for a majority of the Court, recognized that "§ 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the

merits in state court."

> A state court decision is contrary to the Supreme Court's clearly established precedent (1) if the state court applies a rule that contradicts the governing law as set forth in Supreme Court case law, or (2) if the state court confronts a set of facts that are materially indistinguishable from those in a decision of the Supreme Court and nevertheless arrives at a result different from Supreme Court precedent. See Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 1519-20, 146 L. Ed. 2d 389 (2000).

> A state court decision involves an unreasonable application of Supreme Court precedent "if the state court identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case." Williams, 120 S. Ct. at 1520. In addition, a state court decision involves an unreasonable application of Supreme Court precedent "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id.

Bottoson v. Moore, 234 F.3d 526, 531 (11th Cir. 2000). Moreover, as discussed above, the Act, as amended, presumes as correct all determinations of factual issues made by a state court and places the burden upon the petitioner to rebut such a presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e).

I.  Claim 1.

Petitioner argues first in his petition that he is entitled to relief under § 2254 because the trial court committed error when it allowed into evidence the testimonial hearsay statements made by the deceased victim, Felicia Langford, to police officers at the scene of the crime and the hospital, medical personnel, family members, and a volunteer from the rape crisis center in violation of Crawford v. Washington, 541 U.S. 36 (2004).[5]

Packer raised this claim in the state court on direct appeal, and the Alabama Court of Criminal Appeals held as follows:

> The appellant's first argument is that the trial court violated his right to confront and cross-examine witnesses against him when it admitted into evidence the victim's out-of-court statements regarding the offense. Specifically, he contends that the statements were testimonial in nature and that they should have been excluded pursuant to Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).
>
> "The Confrontation Clause, contained in the Sixth Amendment to the United States Constitution provides: 'In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the

---

[5] Petitioner also alleges that the testimony of 911 Operator Sylvia Nettles amounts to inadmissible hearsay in violation of Crawford. However, as this claim is directly related to Petitioner's Claim 4, the Court will address it at the time it discusses Claim 4, infra.

witnesses against him.' In <u>Ohio v. Roberts</u>, 448 U.S. 56 (1980), the United States Supreme Court established a two-part analysis for determining whether certain testimony violates the Confrontation Clause; this analysis focuses on the necessity and reliability of the testimony. This Court discussed that standard in <u>Grantham v. State</u>, 580 So. 2d 53 (Ala. Crim. App. 1991):

> "'"In <u>Ohio v. Roberts</u>, 448 U.S. 56, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980), the Supreme Court 'announced that confrontation clause analysis should proceed case-by-case under a two-track approach that tests the necessity and reliability of the contested testimony.' <u>United States v. Perez</u>, 658 F.2d 654 at 660 (9th Cir. 1981) (citing <u>Roberts</u>, 448 U.S. at 65-66, 100 S. Ct. At 2538-39). The first consideration is the 'rule of necessity' established by the sixth amendment. <u>Roberts</u>, 4448 U.S. at 65, 100 S. Ct. at 2538. 'In the usual case ... the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant.' <u>Id.</u> This necessity requirement is not 'absolute.' <u>Perez</u>, 658 F.2d at 661. The government is not required to produce a seemingly unavailable witness when the 'utility of trial confrontation [is] remote.' <u>Roberts</u>, 448 U.S. at 65 n. 7, 100 S. Ct. At 2538 n. 7. Furthermore, '[t]estimony that is neither "crucial" to the prosecution nor "devastating" to the defendant

might not be subject to the
necessity requirement.' ... If the
government established the
unavailability of the witness,
<u>Roberts</u> then requires that the
declarant's statement bear
adequate 'indicia of reliability.'
<u>Roberts</u>, 448 U.S. at 66, 100 S.
Ct. at 2539."'

"580 So. 2d at 55-56 .... After the decision
in <u>Grantham</u>, the United States Supreme Court
further refined its holding in <u>Ohio v.
Roberts</u>, appearing to reject the
'unavailability' prong of the <u>Ohio v.
Roberts</u> test... Despite these holdings,
however, Alabama Courts continued to apply
the two-part analysis used in <u>Ohio v.
Roberts</u> when reviewing Confrontation Clause
issues... Recently, however, the United
States Supreme Court revisited its holding
in <u>Ohio v. Roberts</u>. In <u>Crawford v.
Washington</u>, ..., the United State Supreme
Court held that the admission of a wife's
out-of-court statements to police officers,
regarding an incident in which the
defendant, her husband, allegedly stabbed
the victim, violated the Confrontation
Clause. The Supreme Court stated that an
out-of-court statement by a witness that is
testimonial is barred under the
Confrontation Clause, unless the witness is
unavailable and the defendant had a prior
opportunity to cross-examine the witness,
regardless of whether such statement is
deemed reliable by the trial court,
abrogating its previous holding in <u>Ohio v.
Roberts</u>. While the Supreme Court applied a
stricter standard to the admission of
testimonial hearsay, however, it did not do
so with regards to nontestimonial hearsay,
noting:

"'Where nontestimonial hearsay is

at issue, it is wholly consistent
with the Framers' design to afford
the States flexibility in their
development of hearsay law – – as
does _Roberts_, and as would an
approach that exempted such
statements from Confrontation
Clause scrutiny altogether.'

...

"Although the Supreme Court held that
_Crawford_ applied to testimonial statements,
it did not provide a comprehensive
definition of testimonial statements,
stating merely that "[w]hatever else the
term covers, it applies at a minimum to
prior testimony at a preliminary hearing,
before a grand jury, or at a former trial;
and to police interrogations."

...

James Dannelly testified that, on January
30, 1995, he was employed by the Mobile Police
Department; that, around 8:45 p.m., he received a
dispatch regarding a rape complaint at Country
Club Woods Apartments; that he was the first
officer to arrive at the scene; that, when he
entered the victim's apartment, the victim was
visibly upset, was shaking, and had red marks
around the front of her neck; and that it
appeared that the victim had been crying. He
also testified that the victim told him about
what had happened and gave a description of her
attacker and that he subsequently transported the
victim to the University of South Alabama Medical
Center.

Lamar Whitten testified that he was an
officer with the Mobile Police Department's
identification unit on January 30, 1995; that he
went to the victim's apartment regarding a rape
report; that he saw the victim at the hospital;

that, in his opinion, the victim was in shock;
that the victim was not showing any emotions at
the time he took her photograph; that the
victim's eyes were very red, and there might have
been some tears in her eyes; and that he thought
that, at that time, the victim was keeping her
emotions inside.

Detective Thomas J. Roberts of the Mobile
Police Department testified that, on January 30,
1995, he was assigned to the sex crimes unit;
that he received a call at approximately 9:15
p.m. regarding a rape at Apartment 227 in the
Country Club Woods Apartments; that he responded
to the University of South Alabama Medical Center
between fifteen and twenty minutes later; that he
saw the victim in an examination room; that the
victim was waiting to be examined; that he
believed that Dorothy Jones from the Rape Crisis
Center was with the victim; that the victim was
visibly upset, sobbing, sad, and trembling; and
that the victim described what had happened to
her and described her attacker.

...

Joseph Anthony Milam testified that was the
victim's boyfriend; that he had dated the victim
for approximately five years; that, between 8:00
p.m. and 9:00 p.m. on January 30, 1995, the
victim telephoned him; that the victim was
screaming, "'[G]et down here I've just been
raped'"; that the victim had "a tone of voice
that [he had] never ever heard out of her
before"; that her voice was shaken and full of
shock and fear; that he asked her what she said,
and she repeated it again in a louder voice; that
the victim sounded even more frightened; that he
assumed the victim was at work and drove to her
place of employment, but she was not there; that
he then drove to the victim's apartment; that it
took him approximately ten minutes to get from
the victim's place of employment to her
apartment; that, when he arrived, law enforcement

officers were there; that he saw the victim
leaning against her refrigerator; that the
victim's head was down and almost on her chest;
that the victim had a sunken look on her face and
her face was red from crying; that, when the
victim had regained her composure, he asked her
what had happened, and she told him; and that the
victim subsequently went to the University of
South Alabama Medical Center. (R. 480.)

Dorothy Jones testified that, in 1995, she
volunteered with the Rape Crisis Center; that, on
January 30, 1995, she was called to the
University of South Alabama Medical Center; that
she made contact with the victim in the emergency
room at approximately 10:30 p.m.; that the victim
was stretched out on the examination table; that
the victim was distraught and sobbing; that the
victim had bruises on her neck and wrist; that,
at times, the victim was withdrawn; that, at
other times, the victim was questioning how
something like this could happen to her; that she
held the victim's hand and tried to comfort her;
that the victim was being interviewed by Roberts
while she was there; and that the victim
described what happened to her. She also
testified that, on her report, she noted that the
victim seemed to be relatively calm.

Doctor Scott Striplin testified that, on
January 30, 1995, he was a resident at the
University of South Alabama Medical Center; that
he treated the victim that night; that the victim
presented to the emergency room at 9:44 p.m.;
that he first saw the victim at 10:30 p.m.; that
the victim was upset, but stable; that her
demeanor was appropriate for the situation; and
that the victim told him about what had happened
to her.

Ethel Taylor testified that she was a
nursing assistant in the emergency room at the
University of South Alabama Medical Center; that
she treated the victim on January 30, 1995; that

she took the victim to a private room; that the
victim was  really upset and traumatized; that
the victim had bruises on her neck; that she put
the victim in her  room, gave her a gown, and
told her that the doctor would come to see her;
that the victim  told her that she had been
raped; and that she told the victim  to wait and
tell the doctor.

Shirley Langford testified that she was the
victim's  mother; that she spoke to the victim at
approximately 2:00 a.m.  on January 31, 1995;
that the victim was very upset, was crying,  and
was very emotional; that the victim told her that
she had  been raped and robbed and that she
thought that she was going to  be killed; that
she later saw the victim between 7:30 a.m. and
8:00 a.m. at Milam's apartment; that, when she
got there, the  victim was sitting on the couch;
that the victim got up and they  ran to each
other and hugged; that the victim repeated that
she  thought she was going to die and that the
man was going to choke  her to death; that they
held each other and cried; that the  victim
described what had happened to her and the person
who had  attacked her; and that the victim kept
repeating that she  thought that the man was
going to kill her.

The statements in the instant case are not
testimonial in  nature.  The appellant argues
that the victim's statements to  law enforcement
officials were  made  in  response  to  an
interrogation.  In Crawford, after determining
that police  interrogations fall within the class
of testimonial hearsay, the  United States
Supreme Court stated:

"We use the term 'interrogation' in its
colloquial,  rather than any technical
legal, sense ... Just as  various
definitions of 'testimonial' exist, one can
imagine various  definitions  of
'interrogation,' and we  need not select

16

> among them in this case. [Crawford's
> wife's] recorded statement, knowingly given
> in response to structured police
> questioning, qualifies under any
> conceivable definition."

Crawford, 541 U.S. at 53, 124 S. Ct. at 1365 n.
4. However, in Crawford, law enforcement
officers arrested Crawford regarding a stabbing
that had occurred earlier that evening. Law
enforcement officers advised Crawford and his
wife of their Miranda [v. Arizona, 384 U.S. 436,
86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)] rights
and interrogated each of them twice.

In this case, the victim's statements to law
enforcement officials - - when she telephoned
911, when she talked to the officer who
responded to the scene, and when she talked to
the detective while she was in the emergency
room and waiting to be examined - - were made
immediately after the rape. Therefore, her
statements were not the result of police
questioning like that involved in Crawford.
Because the victim's statements were not
testimonial in nature, their admission would not
violate the Confrontation Clause if they have
"'sufficient guarantees of reliability to come
within a firmly rooted exception to the hearsay
rule.'"...

In this case, the victim's statements to
Dannelly, Roberts, Milam, Striplin, her mother,
Jones, and Taylor fell under the excited
utterance exception to the hearsay rule.

> "The following are not excluded by the
> hearsay rule, even though the declarant is
> available as a witness:
> "....
>
> "(2)  Excited utterance.  A
> statement relating to a startling
> event or condition made while the

> declarant was under the stress of
> excitement caused by the event or
> condition."

Rule 803(2), Ala. R. Evid.  In <u>A.C.M. v. State</u>,
855 [] So. 2d.  571, 575-77 (Ala. Crim. App.
2002), we addressed the law  regarding excited
utterances as follows:

> "Charles  Gamble  has  stated  the  following
> regarding  Rule 803:
>
> > "'This   rule   sets   out   three
> > conditions which  must be met for
> > admission of the statement.  There
> > must  be  a  startling  event  or
> > condition,  the  statement  must
> > relate  to  the   circumstances  of
> > the occurrence and the  statement
> > must  be  made  before  time  has
> > elapsed   sufficient   for   the
> > declarant  to   fabricate.   The
> > statement must be the  apparently
> > spontaneous   product   of   that
> > occurrence  operating  upon  the
> > visual,   auditory,   or   other
> > perceptive sense of that  speaker.
> > The  declaration   must    be
> > instinctive   rather   than
> > deliberative.  In  short, it must
> > be  the  reflex  product  of  the
> > immediate   sensual   impressions,
> > unaided by  retrospective mental
> > action.  Whether a   statement
> > qualified as an excited utterance
> > is a preliminary and discretionary
> > question  for the trial court.'
>
> "Charles  W.  Gamble,  McElroy's  Alabama
> Evidence   §265.01(1)   (5th   ed.   1996)
> (footnotes  omitted).  'The   question  of
> whether  the  statement  is  spontaneous  in  a
> given case is to be decided upon the facts
> and   circumstances  of  that  case,  and  such

determination is a question for the trial court.'...

"'The Alabama Supreme Court, very early on, described the essential element when it observed that admissibility under the present exception

"'"depends upon whether the circumstances are such as that it may with reasonable certainty be affirmed that the declarations were produced by and instinctive upon the occurrences to which they relate rather than a retrospective narration of them. If they are ebullition of a state of mind engendered by what happened and not a mere statement of the facts as held in memory of a past transaction – if they were made so soon after the difficulty and the declarations, it is reasonably clear that they sprang out of the transaction."

"'This decision made it clear that a statement, to be admissible within the present exception, must be made while the declarant is under the stress of excitement caused by the event or condition. The essence of this historic requirement is found in the word "spontaneous." The trial court, in determining whether the statement was made spontaneously or during the stress of

excitement, ought to consider at
least the following: the degree
of startlingness of the
occurrence; how much time passed
after the occurrence but before
the statement was made; the
effect intervening events; the
nearness of the place where the
statement was made to the place of
the occurrence; the condition of
the declarant; the content of the
statement itself; and all other
facts relating to whether the
declarant was under the stress of
a nervous excitement at the time
the statement was made.

"'One of the primary factors, in any
determination of whether the declarant was
under the stress of excitement when the
statement was made, is the timing of the
statement.... The lapse of time between the
startling event or condition and the
statement is relevant to the issue of
spontaneity but not dispositive of it. The
better approach to this problem, however,
is suggested by those decisions which have
held that the question of spontaneity is to
be decided upon the facts and circumstances
of each individual case and such a
determination is a question for the trial
judge....

"'....

"'It should be kept in mind that
strict contemporaneity should not
be required between the statement
and the occurrence in order for
the declaration to qualify for the
present hearsay exception.
Indeed, our courts have said that
time alone is not a determining
criterion and that applicability

of this exception cannot be decided upon the basis of any specified time or number of minutes between the act and the declaration. The critical factor is whether the person who made the statement is still under the influence of the emotions arising from the startling event. Stated differently, the statement does not have to be made contemporaneously with the startling event or condition but it must be uttered contemporaneously with the excitement resulting from the startling event or condition. How long the excitement prevails is largely determined by the character of the event or condition.'

"....

"Moreover, 'the fact that the utterance was the result of a question is merely a factor to be considered in determining whether the statement was made while the declarant was under the stress of excitement.' Gamble, §265.01(3) (footnote omitted). '[A] statement made in response to a question is admissible as a spontaneous exclamation if the person answering was still under the influence of the excitement or shock of the crime.'..."

In this case, the victim's statements were made during an approximately twelve hour period after the rape and burglary. Also, the State presented evidence that the victim was emotional, crying, distraught, shaking, and in shock at the time she made the statements to Dannelly, Roberts, Milam, Striplin, Jones, Taylor, and her mother. Therefore, the trial

> court could have concluded that the victim was
> still under the stress of the rape and burglary
> at the time she made the statements, and it
> properly found that the statements were excited
> utterances pursuant to Rule 803(2), Ala. R.
> Evid.
>
> Further, the victim's statements to Striplin
> and Taylor were also statements for purposes of
> medical diagnosis or treatment. Therefore, they
> were also admissible pursuant to Rule 803(4),
> Ala. R. Evid.
>
> Because the victim's statements fell within
> deeply-rooted exceptions to the hearsay rule,
> the admission of the statements did not violate
> the appellant's right to confront and cross-
> examine witnesses against him.

(Doc. 20, Ex. F, Alabama Court of Criminal Appeals Opinion)
(citations and footnotes omitted).

In his habeas petition, Petitioner argues that the decision
of the Alabama Court of Criminal Appeals is contrary to federal
law. Petitioner argues that the victim's statements were
"testimonial" and, therefore, their admission violated his right
to confront witnesses against him. (Docs. 5, 25). Petitioner
raised his Sixth Amendment claim on direct appeal. As discussed
above, in order to obtain federal habeas relief on the basis of
claim 1, Packer must show that the state courts resolved this
claim in a manner contrary to or involving an unreasonable
application of federal law as established by United States

Supreme Court precedent.

The Confrontation Clause of the Sixth Amendment provides that, in criminal cases, the accused has the right to "be confronted with witnesses against him." U.S. Const. Amend. VI. In Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354, 148 L. Ed. 2d 177 (2004), the Supreme Court held that the admission of a tape-recorded out-of court statement to police officers at the police station by the defendant's wife, who did not testify at trial, violated the Confrontation Clause. Crawford, 541 U.S. at 68. In so holding, the Supreme Court rejected the notion that the admission of an out-of court statement by a non-testifying witness does not violate the Confrontation Clause if a sufficient indicia of reliability of the statement exists. Id. at 61. The Court held that the right to confrontation bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." Id. at 53-54. While the Court declined to provide a comprehensive definition of "testimonial," it did note that an "accuser who makes a formal statement to government officers bears testimony in a sense that person who makes a casual remark

to an acquaintance does not." Id. at 51[6]. '". Id. at 68.

Later, in Davis v. Washington, 547 U.S. 813, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006), the Supreme Court expounded on the meaning of "testimonial" in a pair of cases involving police interrogation. Id. at 826. In Davis, the Court considered whether statements made by a victim to a 911 operator were testimonial. In the companion case, Hammon v. Indiana, the Court considered whether statements made to police officers at the scene of a domestic disturbance were testimonial. In distinguishing between testimonial and nontestimonial statements, the Supreme Court concluded in Davis that:

> [s]tatements are nontestimonial when made in the
> course of police interrogation under circumstances
> objectively indicating that the primary purpose of the
> interrogation is to enable police assistance to meet

---

[6]The Court discussed various possible formulations of statements which are testimonial: (1) "ex parte in-court testimony or its functional equivalent — that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially"; (2) "extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions"; and (3) "statements that were made under circumstances, which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Id. at 51-52.

an ongoing emergency.  They are testimonial when the
circumstances objectively indicate that there is no
such ongoing emergency, and that the primary purpose
of the interrogation is to establish or prove past
events potentially relevant to later criminal
prosecution.

Id. at 822.

The Court held that the 911 call in Davis was
nontestimonial because it was taken during an on-going
emergency.  The Court observed that a "911 call, and at least
the initial interrogation conducted in connection with a 911
call, is ordinarily not designed to "establish or prove" some
past fact, but to describe current circumstances requiring
police assistance."  Id. at 827.  The Court observed that the
statements elicited in Davis "were necessary to be able to
resolve the present emergency, rather than to simply learn ...
what had happened in the past."  Id.  In addition, the
conversation between the victim and the 911 operator was
informal, as the victim's "frantic answers were provided over
the phone, in an environment that was not tranquil, or even ...
safe." Id.

In contrast, in the <u>Hammon</u> case, the Court held that the statement at issue was testimonial.   In so ruling, the Court observed that "the interrogation was part of an investigation into possible criminal past conduct – as indeed the testifying officer expressly acknowledged."   The Court's ruling focused on the fact that there was no emergency in progress, indeed, when the officer arrived at the scene, the victim told the police that things were fine and that there was no immediate threat to her person. The Court further noted that as in <u>Crawford</u>, the declarant in the <u>Hammon</u> case was actively separated from the defendant at the time of the interrogation, she recounted how potentially criminal past events began and progressed, and the interrogation took place some time after the events described were over. <u>Id.</u> at 841.

As noted supra, in this case, the Alabama Court of Criminal Appeals held that the deceased victim's statements to law enforcement officials, when she called 911, when she spoke to the officer who responded to the scene, and when she talked to officers in the hospital  emergency room were not testimonial because they were not the result of police questioning like the statements involved in <u>Crawford</u>, and they fell within a firmly rooted exception to the hearsay rule-namely the excited

26

utterance exception.  The undersigned finds that under <u>Crawford</u>
and <u>Davis</u>, the deceased victim's statements to the 911 operator
and her statements to the first officer on the scene were not
testimonial because it is clear that the victim's statements
were given for the purpose of securing emergency assistance
rather than to assist in the resolution of a criminal event
after the danger had passed.  Thus, the Alabama Court of
Criminal Appeals did not misapply <u>Crawford</u> in finding that these
statements did not implicate <u>Crawford</u> because they were
nontestimonial.  The fact that  statements made by the victim to
officers at the emergency room, after the danger had passed,
were also admitted is of no moment because it is clear that the
statements provided by the victim at the emergency room were
cumulative of the statements the victim provided to law
enforcement at the scene, as well as statements that the victim
provided to non-law enforcement personnel.

The Supreme Court's decisions in <u>Crawford</u> and <u>Davis</u> did not
involve statements to non-law enforcement personnel.  However,
courts have generally held that statements made in private
conversations to friends and family members are not testimonial.
<u>See</u>, <u>e.g.</u>, <u>U.S. v. Franklin</u>, 415 F.3d 537, 545 (6th Cir. 2005)
(holding that statements made to a "friend and confidant" are

not testimonial for purposes of the Confrontation Clause; <u>Evans v. Luebbers</u>, 371 F.3d 438, 445 (8th Cir. 2004), cert denied, 543 U.S. 1067, 125 S. Ct. 902, 160 L. Ed. 2d 800 (2005) (holding murder victim's statements to friends that defendant had abused her like O.J. Simpson and that she might end up like Nicole Simpson were considered nontestimonial). Indeed, as observed in <u>Crawford</u>, "a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." 541 U.S. at 51.

As determined by the Alabama Court of Criminal Appeals, the deceased victim's out of court statements to her mother, boyfriend, medical personnel and rape crisis volunteer, made within hours of the assault, were nontestimonial and did not implicate the Confrontation Clause. Specifically, the court found that these statements, which occurred during the approximately twelve (12) hour period after the rape and burglary, were properly admitted by the trial court pursuant to Rule 803(2), Ala. R. Evid., which creates an exception to the hearsay rule for "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition," or an excited utterance. (Doc. 20, Ex. F at 56-7). The appellate court

reasoned that because the State presented evidence that the victim was emotional, crying, distraught, shaking, and in shock when she made the statements testified to, the trial court could have concluded that the victim was still under the stress resulting from the rape and burglary. (Id. at 60).   Further, the court opined that the victim's statements to the doctor and nursing assistant who treated her during her visit to the emergency room were for purposes of medical diagnosis or treatment, and thus, were also admissible under Rule 803(4), Ala. R. Evid.   For the precise reasons found by the Alabama Court of Criminal Appeals in its unpublished opinion, this Court agrees that the trial court's admission of the deceased victim's statements to  hospital workers, a rape crisis volunteer, and her boyfriend and mother was proper.   Moreover, as found by the Alabama Court of Criminal Appeals, assuming arguendo that the admission of the victim's statements to law enforcement officials were erroneous, said admission was harmless because the statements were cumulative of the statements the victim made to non-law enforcement personnel.   "Before a court can grant relief on the basis of a violation of the Confrontation Clause, the court must apply harmless error analysis." Kittelson v. Dretke, 426 F.3d 306, 319 (5th Cir. 2005) The test for harmless

error in a federal habeas corpus action brought by a state prisoner is the standard set forth in Brecht v. Abrahamson, 507 U.S. 619, 113 St. Ct. 1710, 123L. Ed. 2d 353 (1993), that is, that the constitutional error "had a substantial and injurious effect or influence in determining the jury's verdict. " Id. at 319-320 quoting Brecht, 507 U.S. at 623; see also Grossman v. McDonough, 466 F/ 3d 1325 (llth Cir. 2006)[7]. In Grossman, the Eleventh Circuit rejected the petitioner's request for habeas

---

[7]The habeas harmless error standard is even more difficult to satisfy than the State's "beyond a reasonable doubt" standard. In Grossman, the Eleventh Circuit explained:

> In Brecht, the Supreme Court noted the differences between the Kotteakos harmless error standard and the "harmless beyond a reasonable doubt" standard, and determined that the harder-to-establish Kotteakos formulation was more appropriate in the habeas context, which is designed to afford relief only to those whom society has "grievously wronged." Brecht, 507 U.S. at 637, 113 S. Ct. 1710. The Brecht Court cited as compelling factors "the State's interest in the finality of convictions that have survived direct review within the state court system," principles of "comity and federalism," the need to avoid degrading the significance of trial or encouraging relitigation of claims, the character of habeas corpus as an unusual remedy, and the social costs and practical difficulties of retrying a defendant after a grant of habeas relief.

Grossman, 466 F.3d at 1339.

relief where the trial court erred in admitting the petitioner's co-defendant's confession, which implicated the petitioner and was not subject to cross-examination.  The court held that where admission of the confession did not have a "substantial and injurious effect or influence in determining the jury's verdict," the error was harmless.  Id. at 1340.

In this case, there is no likelihood that the admission of the victim's statements to law enforcement personnel had a substantial and injurious effect on the jury's verdict.  As noted supra, the victim's statements to law enforcement were cumulative of the statements that the victim provided to non-law enforcement persons such as her mother, boyfriend, rape counselor, and medical providers.  Moreover, the state presented strong DNA evidence  which tied Packer to the assault.  In addition, Detective Mickey Domen offered testimony regarding Packer's peculiar behavior when questioned in connection with the victim's assault[8].  Accordingly, any constitutional error

---

[8]Officer Mickey Domen testified that when he met with Petitioner on October 12, 1995, after having him sign a Warning and Consent to Speak, Warning of Rights form, and again on October 13, 1995, Petitioner was visibly nervous, and he began to whimper and cry. (Doc. 20, Ex. A, Pt. 5 R.585).  Petitioner twice asked Detective Domen if it would be better if he cooperated and stated that he "needed some help." (Id. at R.585-86, R.642). Packer told Domen that he wanted to tell him some things, but he would neither admit nor deny anything when asked

committed by the trial court in admitting the victim's statements to law enforcement was harmless. Under Brecht, "a constitutional trial error is not so harmful to entitle a defendant to habeas relief unless there is more than a mere reasonable possibility that it contributed to the verdict." Nixon v. Epps, 405 F.3d 318, 329-30 (5th Cir. 2005). Thus, Packer has not established that he is entitled to relief under § 2254(d).

II.  Claim 2.

In Claim 2, Petitioner argues in his petition that he is entitled to relief under § 2254 on the ground that the trial court committed error by denying his motion to suppress DNA evidence, which was obtained in violation of his Fourth Amendment right against unreasonable search and seizure pursuant to Franks v. Delaware, 438 U.S. 154 (1978). Packer presented this same argument to the Alabama Court of Criminal Appeals on direct appeal, and, in its memorandum opinion affirming his conviction, the court stated:

> The appellant's second argument is that the trial

---

if he wanted to admit to anything. (Doc. 20, Ex. A, Pt. 8, R.1108-1109). Officer Domen testified that he had not intended to ask Petitioner any questions and that he did not anticipate Petitioner's "spontaneous" responses and emotional reaction to their meeting. (Id. at R. 662, 670).

court  erroneously denied his motion to suppress his
DNA samples and  his statement to Detective Mickey
Domen.  Specifically, he  contends that Domen violated
his rights under the Fourth  Amendment and Sixth
Amendment to the United States Constitution.

A.

Initially, the appellant contends that Mickey
Domen   intentionally used false and misleading
information in his  affidavit in support of the
"Motion to Take Samples." The State  presented
evidence that Mickey Domen was involved in the
investigation of the rape of a woman named Misty Lee
that  occurred at Country Club Woods Apartments on
August 19, 1995.  On October 12, 1995, as part of that
investigation, Domen filed  a motion to obtain a blood
sample and other body samples from  the appellant and
an affidavit in  support of that motion.  A  judge
issued an order for the samples on October 12, 1995.
On  October 13, 1995, Domen and a nurse obtained the
samples, and  they were turned over to the Alabama
Department of Forensic  Sciences.  Subsequently, the
blood stain card made from the  appellant's blood
sample was used during the analysis of the  vaginal
swab from the victim in this case and during the
analysis of semen that was found on the skirt of the
victim in  this case.

In his affidavit in support of the motion to take
samples,  Domen stated:

"I am presently conducting an investigation
into  the RAPE FIRST DEGREE of MISTY ELLA
LEE which occurred  on AUGUST 19, 1995, at
4031 AIRPORT BLVD. #42 in Mobile, which is
in Mobile County, Alabama.  [THE APPELLANT]
has been identified by the Victim as the
person responsible for said rape."

(C.R. 1029.) During a hearing on the motion to
suppress the  samples, Domen testified that Lee had
tentatively identified the  appellant from a
photospread.  Subsequently, the appellant  introduced

33

a transcript of Lee's and Domen's testimony from the
appellant's trial for the charges in which Lee was the
victim.  During that trial, Lee testified that she
picked the appellant  out of a photographic lineup;
that she told Domen she was not  exactly sure it was
him; that she was  not going to say that she  was one-
hundred percent sure because she was concerned about
falsely  accusing  someone;  and  that  she  did  not
positively  identify the appellant.  Also, during that
trial,  Domen    testified  that,  at  3:10  p.m.  on
September 22, 1995, he showed  Lee a photographic
lineup, and Lee tentatively identified the  appellant
and said that "'she really felt this was the man.'"
(C.R. 1138).

The appellant asserts that "Domen knew that Misty
Lee  could    not   positively  identify  [him],  and
therefore, his unequivocal  statement in his affidavit
that '[he] has been identified by the  victim as the
person responsible for said rape,' is an  intentional
misstatement."   (Appellant's  brief  at  p.  26.)
However, based on Domen's testimony at the suppression
hearing   and Lee's and Domen's testimony during the
previous   trial,  it   does  not  appear  that  Domen's
affidavit contained false or  misleading information.
Therefore,  the  trial  court  properly   denied  the
appellant's motion to suppress his DNA samples on
this ground.

(Doc. 20, Ex. F at 61-62).

According to Petitioner, Detective Mickey Domen used false

and misleading statements and made material misrepresentations

in his affidavit in support of a warrant to obtain Petitioner's

blood. (Docs. 5, 25). According  to  Packer, Detective Domen

misrepresented  that  a  victim  in  another  rape  investigation,

Misty Lee, positively identified Packer as her attacker.  Packer

avers  that  Lee  only  tentatively  identified  him  as  the

34

perpetrator.  (Id.; Doc. 20, Ex. A, Pt 1, pp. 199-204).  The blood and resulting DNA obtained via the disputed search warrant were used during the analysis of the vaginal swab obtained from the deceased victim, Felicia Langford, in addition to the male DNA evidence obtained from her clothing.  In confirming the trial court's decision, the Alabama Court of Criminal Appeals found that based upon Domen's testimony at Petitioner's suppression hearing and during the trial of the Lee rape case, in addition to Lee's testimony, Domen's affidavit did not contain false or misleading information.

Again, in order to obtain federal habeas relief on the basis of claim 2, Packer must show that the state courts resolved this claim in a manner contrary to or involving an unreasonable application of federal law as established by United States Supreme Court precedent.  In Franks v. Delaware, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978), a criminal defendant challenged the veracity of averments made by police officers in affidavits in support of a search warrant.  The Supreme Court held that the defendant could challenge a warrant and subsequent search under the Fourth Amendment if he could prove by a preponderance of the evidence that the affiant had included a material false statement in the warrant application

knowingly and intentionally, or with reckless disregard for the truth.[9] See id. at 155-56. Allegations of "negligence or innocent mistake" are insufficient. Id. at 171.

The Supreme Court established the procedures to be utilized where a defendant challenges the truthfulness of statements in an affidavit used to procure a search warrant:

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and with the affidavit's false material set to one side, the

---

[9]A person seeking to challenge the truthfulness of an affidavit in support of a search warrant must meet the threshold requirement of a "substantial preliminary showing" that false statements were deliberately or recklessly made.

> There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained.

Franks, 438 U.S. at 171.

> affidavit's remaining content is insufficient to
> establish probable cause, the search warrant must
> be voided....

Id. at 155-156.

While the Alabama Court of Criminal Appeals did not mention Franks v. Delaware, or any comparable case, in its analysis of Packer's attack on the trial court's denial of his motion to suppress and Domen's affidavit, recognition by the appellate court of the proper analysis is clear from a reading of that decision. Cf. Early v. Packer, 537 U.S. 3, 8 (2002) ("Avoiding these pitfalls does not require citation to our cases - indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."). Moreover, the undersigned finds that the decision of the Alabama Court of Criminal Appeals, as it relates to Petitioner's Fourth Amendment claim, did not arrive at any conclusion opposite to those reached by the Supreme Court of the United States on any question or law, nor did it unreasonably apply governing Supreme court precedent to the facts of the case.[10] Thus, Petitioner is not entitled to habeas relief on the

---

[10]Furthermore, even assuming arguendo that Detective Domen's affidavit included a material false statement in the warrant application, other than this conclusory allegation, Petitioner has not put forth evidence to show Domen made the statement knowingly and intentionally, or with reckless disregard for the

basis of Claim 2.

III. <u>Claim 3</u>.

Petitioner next argues in his petition that he is entitled to habeas relief because the trial court erroneously denied his motion to suppress DNA samples, where there was a missing link in the State's chain of custody, and the trial court violated the ex post facto clause of the U.S. Constitution, pursuant to <u>Weaver v. Graham</u>, 450 U.S. 24, 101 S. Ct. 960, 67 L. Ed. 2d 17 (1981), by applying § 12-21-13, Ala. Code 1975, because that statute was not in effect at the time of the offense.

The Court begins its analysis of Packer's third claim with the principle that federal habeas relief for state prisoners attacking their conviction is limited in scope:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody *in violation of the Constitution or laws or treaties of the United States*.

28 U.S.C. § 2254(a) (West 2004) (emphasis added). "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of a

---

truth and that is was not mere "negligence or innocent mistake."

constitutional dimension." Smith v. Phillips, 455 U.S. 209, 221 (1982).   Questions of state law rarely have federal constitutional significance because "[a] state's interpretation of its own laws or rules provides no basis for federal habeas corpus relief, since no question of a constitutional nature is involved." Carrizales v. Wainwright, 699 F.2d 1053, 1055 (11th Cir. 1983).   Such questions are reviewed in federal habeas proceedings only to determine whether the alleged errors rendered "the entire trial fundamentally unfair." Id. at 1055.

In reviewing an evidentiary determination of a state trial court, the federal court will "not sit as a 'super' state supreme court." Shaw v. Boney, 695 F.2d 528, 530 (11th Cir. 1983) (citations omitted).   In Shaw, the Eleventh Circuit explained:

> Unlike a state appellate court, we are not free to grant the petitioner relief simply because we believe the trial judge has erred. The scope of our review is severely restricted.   Indeed, the general rule is that a federal court will not review a trial court's actions with respect to the admission of evidence.   [Citations omitted]. A state evidentiary violation in and of itself does not support habeas corpus relief.   [Citations omitted].   Before such relief may be granted, the violation must rise to the level of a denial of "fundamental fairness."   [Citations omitted].
> In the context of state evidentiary

rulings, the established standard of
fundamental fairness is that habeas relief
will be granted only if the state trial
error was "material in the sense of a
crucial, critical, highly significant
factor." [Citations omitted]. Moreover,
application of this standard has been
notably one-sided, consistent with the
reluctance of federal courts to second-guess
state evidentiary rulings. This court has
established a well-documented resistance to
granting relief when a habeas petition
alleges a federal claim based merely on a
state evidentiary ruling.

Id.

Thus, habeas claim 3 is to be reviewed only to determine

whether the alleged error "render[ed] the entire trial

fundamentally unfair." Carrizales v. Wainwright, 699 F.2d 1053,

1055 (11th Cir. 1983).

The appellate court held that evidence retrieved from the

victim's clothing was admissible under § 12-21-13, Ala. Code

1975, and rejected Petitioner's argument, finding no grounds for

reversal, stating:

The appellant's third argument is that the trial
court erroneously denied his motion to suppress the
DNA evidence against him on the ground that the State
did not establish an adequate chain of custody for the
victim's rape kit and the bag containing the victim's
clothes. Specifically, he contends that there was a
break in the chain of custody between the time Ethel
Taylor put on the evidence in the hospital
refrigerator and the time Officer T.J. Roberts
received the evidence from the hospital. To prove
chain of custody, the State must sufficiently
establish (1) the receipt of the evidence; (2) the

40

ultimate disposition of the evidence; and (3) the
safeguarding and handling of the evidence between
receipt and disposition. See Ex parte Holton, 590 So.
2d 918 (Ala. 1991). "'The purpose for requiring that
the chain of custody be shown is to establish to a
reasonable probability that there has been no
tampering with the evidence.'"...

    Dr. Scott Striplin testified that he performed a
sexual assault examination on the victim; that he
used a rape kit to collect the evidence; that Ethel
Taylor assisted him in examining the victim; that, as
part of his protocol, he would take a vaginal and a
cervical swab, made a wet prep out of both of them,
look for the presence of sperm, and make sure at least
one of the swabs made it into the rape kit; that his
record indicated that he made two wet mounts; that he
also did the pubic combing; and that, based on his
records, he gave the vaginal swab, the two wet mounts,
and the pubic hair combings to Taylor.

    Ethel Taylor testified that she was a nursing
assistant at the University of South Alabama Medical
Center; that she worked in the trauma center in the
emergency room; that, on January 30, 1995, she was
involved in treating the victim; that she collected
the victim's clothes, put them in a brown paper bag,
labeled it as evidence, and sealed it with white tape;
that she assisted the doctor in performing the rape
kit on the victim; that she took a mouth swab, pubic
hair, and head hair from the victim; that she put the
items into the premarked envelopes and sealed them;
that she labeled the items with the victim's name, her
name, the date, and the time; that she put each
envelope into the rape kit; that the doctor would
perform a wet prep; that, when the doctor finished, he
would put the wet prep into an envelope, and she would
label the envelope, seal it, and put it into the rape
kit; that the doctor would perform a pubic hair
combing and put the combings into an envelope; that
she would seal the envelope with the pubic hair
combings, label it, and put it into the rape kit;
that the doctor then performed the pelvic
examination; that he would take two swabs; that he

41

would put one swab into an envelope; that she sealed
the envelope, labeled it, and put it into the rape
kit; that the doctor would use one swab to make two
slides; that the doctor sometimes threw the other swab
away; that Donna Moffett drew the victim's blood; that
Moffett gave her one tube of blood, and she put it
into the rape kit; that, when the doctor completed the
examination and the report, she and the doctor would
sign the report; that she  would make a copy of the
report  and put one copy into the rape kit; that she
would then seal the kit; that the kit would have to
victim's name and her name on it;  that she put the
rape kit  and the bag of clothing in the refrigerator
the she did not touch the evidence again after she
placed it in the  refrigerator; and that she did not
give the rape kit to anyone.  She also testified that
the refrigerator is not locked; that the  area where
the refrigerator is located is not locked; and that,
to her knowledge, no one goes into that refrigerator.
Finally,  at trial, Taylor identified State's Exhibit
#40 as the victim's  rape kit that she had sealed.

Donna Moffett testified that she was a licensed
practical  nurse at the University of South Alabama
Medical Center; that,  at 11:00 p.m. on January 30,
1995, she drew the victim's blood for the  sexual
assault kit; and that she placed the blood into an
envelope, sealed it, and gave it to Taylor.

Roberts  testified that, around noon on January
31, 1995, he  went to the University of South Alabama
Medical Center; that he  picked up a rape kit and a
bag of clothes; that both items were  sealed; that the
rape kit was labeled with the victim's name,  the
doctor's name, the hospital's name, and the nurse's
name;  and that the bag of clothes was labeled with
the victim's name.  He also testified that he believed
that Taylor had given him the  rape kit and the bag of
clothes, but that it could have been  someone else.

Section  12-21-13,  Ala.  Code  1975,[11]

----

[11] The appellant also contends that §12-
21-13, Ala. Code  1975, does not apply

provides:

"Physical evidence connected with or collected in the investigation of a crime shall not be excluded from consideration by a jury or court due to a failure to prove the chain of custody of the evidence. Whenever a witness in a criminal trial identifies a physical piece of evidence connected with or collected in the investigation of a crime, the evidence shall be submitted to the jury or court for whatever weight the jury or court may deem proper. The trial court in its charge to the jury shall explain any break in the chain of custody concerning the physical evidence."

Because Taylor identified State's Exhibit #40 as the victim's rape kit, any question regarding the adequacy of the safeguarding and handling of State's Exhibit #40 did not go to its admissibility. Rather, it went to the weight the jury would assign to the evidence.

Also, the DNA evidence found on the victim's skirt was cumulative to the DNA evidence found on the vaginal swab. Therefore, error, if any, in the admission of the DNA evidence obtained from the victim's skirt was harmless. <u>See</u> Rule 45, Ala. R. App. P...

The court found Petitioner's ex post facto claim was

> to his case because it was in effect at the time of the offense. However, §12-21-13, Ala. Code 1975, is a procedural rule. "Matters which are procedural in nature are governed by the law applicable on the date of trial." ... Because § 12-21-13, Ala. Code 1975, was in effect at the time of the appellant's trial, his argument is without merit. (Footnote in original).

without merit because § 12-21-13 is a procedural rule, application of which is governed by the law in effect on the date of trial. Article I, § 10, of the United States Constitution prohibits the States from enacting an ex post facto law. The United States Supreme Court has held that "three critical elements must be present" to establish an Ex Post Facto Clause violation: the statute must be a criminal or penal measure, apply retrospectively and inflict a greater punishment on the offender. Paschal v. Wainwright, 738 F.2d 1173, 1175-76 (11th Cir. 1984) (citing Weaver v. Graham, 450 U.S. 24, 29, 101 S. Ct. 960, 67 L. Ed. 2d 17 (1981)) (footnote omitted). However, "[a] law which is merely procedural and does not add to the quantum of punishment ... cannot violate the ex post facto clause even if it is applied retrospectively." Dufresne v. Baer, 744 F.2d 1543, 1546 (11th Cir. 1984) (citations omitted), cert. denied, 474 U.S. 817, 106 S. Ct. 61, 88 L. Ed. 2d 49 (1985).

Further, the Alabama Court of Criminal Appeals determined that because Nursing Assistant Ethel Taylor identified State's Exhibit #40 as the victim's rape kit, questions regarding the adequacy of the handling of the kit did not go to its admissibility but rather to the weight the jury would assign the evidence. Petitioner has not shown that application of § 12-21-

13 and admission of DNA evidence from the victim's clothing was improper under Alabama law, nor that any error by the state court rendered his entire trial fundamentally unfair.  Moreover, for the precise reasons stated in the memorandum opinion of the Alabama Court of Criminal Appeals, this Court agrees that Petitioner's rights were not violated.  Thus, being no error in the state court's decision denying relief on this claim, the state court's ruling did not deprive Petitioner of fundamental fairness.  Accordingly, Claim 3 fails to state a cognizable habeas claim and is due to be denied.

IV. Claim 6.

Next, Petitioner claims that the trial court erred by denying his motion to suppress DNA evidence which was obtained in violation of his Sixth Amendment right to counsel. Specifically, Petitioner claims that he "was denied his Sixth Amendment right to counsel when the state collected his blood samples." (Doc. 17).  Petitioner presented this claim on direct appeal, and the Alabama Court of Criminal Appeals found as follows:

> The appellant also contends that law enforcement authorities violated his Fifth and Sixth Amendment rights because he did not have counsel present when

the DNA samples were taken. Rule 16.2(b), Ala. R.
Crim. P., provides for the taking of blood and other
bodily samples at the State's request. It also
provides that "[t]he defendant shall be entitled to
the presence of counsel at the taking of such
evidence." Rule 16.2(b), Ala. R. Crim. P. However,
the record does not indicate that the appellant
requested that his attorney be present during the
taking of the samples. At most, Domen testified that,
the appellant told him that he had previously had a
hearing and that an attorney, whose name he could not
remember, had been appointed for him. Therefore, the
trial court properly denied the motion to suppress
his DNA samples on this ground.

....

(Doc. 20, Ex. F at 62-63).

Again, since Packer's issue has been considered by the
state courts on the merits, in order to obtain federal habeas
relief on the basis of claim 6, he must show that the state
courts resolved this claim in a manner contrary to or involving
an unreasonable application of federal law as established by
United States Supreme Court precedent. Petitioner argues that
the decision of the Alabama Court of Criminal Appeals is
contrary to Carnley v. Cochran, 369 U.S. 506 (1962).

In Carnley, the U.S. Supreme Court held that the illiterate
defendant had a due process right to assistance of counsel for
his defense during trial. 369 U.S. at 513. The petitioner,
whose right to counsel had attached, was convicted of various

charges of sexual misconduct against his daughter after proceeding through his entire trial without the assistance of counsel. The U.S. Supreme Court reversed the Supreme Court of Florida's decision discharging the petitioner's writ of habeas corpus because the record failed to show that he was offered the aid of counsel, as guaranteed by the Fourteenth Amendment, or that he waived such right to an attorney during his criminal trial. However, the Carnley case is inapposite to the instant claim by Petitioner.

Unlike the Carnley case, in the present action, Packer is not attacking a lack of counsel during the course of his criminal trial.[12] Rather, Petitioner challenges his lack of counsel during the time samples of his blood were taken, pursuant to a search warrant, in order to perform a DNA analysis after he was brought for an initial appearance. (Doc. 17). The appellate court found that Rule 16.2(b), Ala. R. Crim. P.,[13]

---

[12]The record indicates that Packer was represented at trial by attorneys James Byrd and Joe Carl Jordan. (Doc. 5 at 18).

[13]"Upon motion of the state/municipality and solely in connection with the particular offense with which the defendant is charged, the court shall order the defendant to:

(1) Appear in a line-up;

(2) Speak for identification by witnesses;

provides for the taking of blood and other bodily samples at the State's request, but that a defendant is entitled to the presence of counsel. (Doc. 20, Ex. F, p. 63).   However, according to the appellate court, because the record before the court did not reflect that Packer requested counsel, the trial court properly denied his motion to suppress. (Id.)

In United States v. Wade, 388 U.S. 218 (1967), the employees of a robbed bank identified the defendant in a lineup that had been conducted without counsel being present. At trial, the employees pointed to the defendant when asked to identify

---

(3) Be fingerprinted, palm-printed, footprinted, or voice-printed;

(4) Pose for photographs not involving reenactment of an event;

(5) Try on clothing;

(6) Permit the taking of samples of defendant's hair, blood, saliva, urine, or other specified materials which involve no unreasonable intrusions into the body;

(7) Provide specimens of defendant's handwriting; or

(8) Submit to a reasonable physical inspection or medical examination of defendant's body, but such inspection or examination will not include a psychiatric or psychological examination, unless such psychiatric or psychological examination is authorized under the provisions of Rule 11.2(a)(1) and (2), Rule 25.4, or Rule 26.4.

The defendant shall be entitled to the presence of counsel at the taking of such evidence. This section shall supplement and not limit any other procedures established by law." Ala. R.

the robber, and he was convicted.  The Supreme Court held that a post-indictment lineup was a critical prosecutive stage at which an accused was entitled to the presence of counsel. However, the Court also explained that a defendant is not entitled to advice of counsel when asked to give evidence of a physical nature, such as his fingerprints or samples of blood, hair, or clothing, because, in those cases, "the accused has the opportunity for a meaningful confrontation of the Government's case at trial through the ordinary processes of cross-examination of the Government's expert witnesses and the presentation of the evidence of his own experts." Id. at 227-28.[14]

---

Crim. P. 16.2(b).

[14]The respondent points to Schmerber v. California, 384 U.S. 757, 765-66, 16 L. Ed. 2d 908, 86 S. Ct. 1826 (1966), where the Supreme Court upheld a state-compelled blood test against, inter alia, a challenge that the coerced blood test violated the right to counsel. In that case, the petitioner was advised by his counsel that he should not submit to the test. With respect to his Sixth Amendment argument, the Court reasoned:

> Since petitioner was not entitled to assert the privilege [to refuse to take the test], he has no greater right because counsel erroneously advised him that he could assert it. . . . No issue of counsel's ability to assist petitioner in respect of any rights he did possess is presented. The limited claim thus made must be rejected.

Id. at 766.

Subsequently, the Eleventh Circuit, in U.S. v. Hidalgo, 7 F.3d 1566 (11th Cir. 1993), explained, in a situation analogous to the instant claim, that the right to counsel in post-indictment situations only attaches at critical stages of the proceedings against the accused. Specifically, the court observed that the defendant's Sixth Amendment right to counsel was not violated by his lack of counsel when he consented to a search of his residence because a request for a consent to search is not a critical stage of a criminal proceeding. Id. at 1569 (discussing U.S. v. Kon Yu-Leung, 910 F.2d 33 (2nd Cir. 1990)). The Court likened the consent to search request to requests for other types of physical evidence which "do[] not generate evidence, but merely reveal evidence 'already in existence and virtually certain to be available to the government in due course.'" Id. at 1570 (quoting Kon Yu-Leung, 910 F.2d at 40). The Court reasoned:

> The request for a consent to search is not a trial-like confrontation where the absence of counsel poses a threat of substantial prejudice to the accused like that posed by the absence of counsel at a pretrial lineup, or a pretrial interrogation. Instead, it is more analogous to a request for other types of physical evidence, such as handwriting exemplars, blood samples, and the like, or to a photographic display. As in

>    those situations, the accused can have a
>    meaningful confrontation of the evidence against
>    him through the ordinary trial processes. For
>    these reasons, we agree with the Second Circuit
>    that a consent to search situation is not a
>    critical stage of the proceedings against an
>    accused to which the right of counsel attaches.
>    Hidalgo's Sixth Amendment rights were not
>    violated by his lack of counsel when he consented
>    to a search of his residence after he had been
>    indicted.

Hidalgo, 7 F.3d at 1570.

While the Alabama Court of Criminal Appeals did not mention Hidalgo, Wade, or Schmerber, or any comparable case, in its analysis, recognition by the appellate court of the proper analysis is clear from the entirety of its discussion of Packer's claim alleging error by the trial court in denying his motion to suppress based on his allegation of denial of his right to counsel. Other than Petitioner's self-serving statements that he did request counsel, there is nothing in the record to indicate that he, indeed, requested that counsel be present while blood samples were taken. (Docs. 17, 25). Further, at trial, Petitioner was permitted "the opportunity for a meaningful confrontation of the Government's case at trial through the ordinary processes of cross-examination of the Government's expert witnesses and the presentation of the evidence of his own experts." Therefore, the undersigned cannot

find that the decision of the Alabama Court of Criminal Appeals, as it relates to Petitioner's claim of a denial of his right to counsel, was contrary to law nor can it be found that the state court unreasonably applied relevant precedent. Accordingly, Petitioner's request for habeas relief on the basis of Claim 6 is due to be denied.

### Part Two: Claims 4 and 5

Petitioner argues in his Claim 4 that he is entitled to relief under § 2254 because the Alabama Court of Criminal Appeals erred in its application of the harmless error analysis of his claim under Crawford v. Washington, 541 U.S. 36 (2004). With respect to Claim 5, Petitioner argues that he is entitled to habeas relief because the Alabama Court of Criminal Appeals erred in its application of the harmless error analysis to the admissibility of DNA evidence obtained from the deceased victim's skirt.  While it appears that Petitioner failed to fully exhaust these claims in the state courts,[15] under 28 U.S.C.

---

[15] The exhaustion doctrine requires that a petitioner "give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999).  In Alabama, the established appellate review process includes an appeal to the Alabama Court of Criminal Appeals, an application for rehearing to the Alabama

§ 2254(b)(2), "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."  See also Thompson v. Sec'y for Dep't of Corrs., 517 F.3d 1279, 1283 (11th Cir. 2008) ("We may, however, deny Petitioner's petition for habeas relief on the merits regardless of his failure to exhaust the claim in state court.") (citing 28 U.S.C. § 2254(b)(2)).  Having considered both of these claims de novo, the Court finds them to be without merit.

   V.   Claim 4.

      As discussed in Claim 1 above, Petitioner alleges that the trial court committed error when it allowed into evidence the testimonial hearsay statements made by the deceased victim to a 911 operator, police officers at the scene of the crime and the hospital, medical staff, family members, and a rape crisis volunteer in violation of Crawford v. Washington, 541 U.S. 36

---

Court of Criminal Appeals, and an application for discretionary review by the Alabama Supreme Court.  See Ala. R. App. P. 4, 39, 40.  A review of the record does not indicate that Petitioner raised each of his challenges to the appellate court's harmless error analysis in his application for rehearing (Doc. 20, Ex. E), presumably the first time that he could have done so. Instead, Packer appears to have presented these claims for the first time in his petition for a writ of certiorari.  (Doc. 20, Ex. F).  Therefore, his due process claims were not fully

(2004). (Docs. 5, 13, 25).  In his Claim 4, Packer challenges the appellate court's harmless error analysis of his <u>Crawford</u> claim.

In this case, the trial court permitted Mobile Police Department Communications Officer Sylvia Nettles to testify about the 911 call made by the deceased victim after she was raped.  According to the Alabama Court of Criminal Appeals:

> Sylvia Nettles testified that she was a communications officer at the Mobile Police Department; that 911 received a rape complaint by the victim at 8:49 p.m. on January 30, 1995; and that she did not take the call or listen to the complaint.  She also testified about the description the victim gave of her attacker in that call. [footnote omitted]

(Doc. 20, Ex. F at 6).

In addition to the foregoing recitation of facts, the appellate court observed that while the State failed to present evidence about the victim's disposition when she made the 911 call, even assuming the statement to 911 was testimonial and admitted in error, the statement was merely cumulative to all other statements, and the error was harmless.

As noted supra, the undersigned finds that under <u>Crawford</u> and <u>Davis</u>, the deceased victim's statements to the 911 operator exhausted and are now procedurally defaulted.

were not testimonial because it is clear that the victim's statements, made shortly after being victimized, were given for the purpose of securing emergency assistance rather than to assist in the resolution of a criminal event after the danger had passed. Thus, the Alabama Court of Criminal Appeals did not misapply _Crawford_ in finding that the statements did not implicate _Crawford_ because they were nontestimonial.

Assuming arguendo that the victim's statements during the 911 call were testimonial, and the trial court did err in admitting the statements, the Alabama Court of Criminal Appeals correctly found that any error was harmless. First of all, the testimony regarding the 911 call was cumulative of testimony offered by the victim's mother, boyfriend, rape counselor and medical providers. It was also cumulative of the testimony of other law enforcement personnel. In addition, there was other evidence pointing to Packer's guilt, including strong DNA evidence and Detective Domen's testimony regarding Packer's peculiar behavior during questioning. Accordingly, based upon the record evidence, the Court cannot say that assuming arguendo that the admission of the victim's statements to the 911 operator was erroneous that the error "had a substantial and injurious effect or influence in determining the jury's verdict."       Thus, the Alabama Court of Criminal Appeals

reasonably determined that any error in the admission of the victim's statements to the 911 operator was harmless, and said decision was not contrary to clearly established federal law.

VI. <u>Claim 5</u>.

As aforementioned in Claim 3 above, Petitioner alleges that the trial court committed error by denying his motion to suppress DNA evidence on the grounds that there was a missing link in the state's chain of custody and that the trial court's application of § 12-21-13, Ala. Code 1975 violated his right to be free from ex post facto application of the law.[16] In the present claim, Packer challenges the appellate court's harmless error analysis concerning the admissibility of DNA evidence obtained from the victim's clothing, which was admitted at trial, and alleges that his due process rights were violated. (Doc. 13 at 3). Petitioner incorrectly asserts that the Alabama Court of Criminal Appeals found that the disputed DNA evidence was inadmissible. (<u>See</u> <u>id.</u>). In fact, the court stated that because Nursing Assistant Taylor identified the State's exhibit as the victim's rape kit, Petitioner's missing link argument was without merit because any questions regarding the handling of

---

[16]The Alabama Court of Criminal Appeals determined Petitioner's ex post facto claim was without merit because § 12-21-13 is a procedural rule, which is governed by the law applicable on the date of trial.

the evidence went to the weight the jury would assign, not to its admissibility. The court further noted that because the DNA evidence from the victim's clothing was cumulative of the DNA evidence obtained from the victim's vaginal swab, any error in admitting the DNA evidence from the victim's skirt was harmless. (Doc. 20, Ex. F, p. 67).

Having found that the appellate court did not err in admitting this evidence, Petitioner's instant claim must also fail. Assuming arguendo that DNA evidence from the victim's clothing should not have been admitted, Petitioner has failed to show that any error in admitting the evidence from the skirt had a "substantial and injurious effect or influence in determining the jury's verdict." Grossman, 466 F.3d at 1340. The record reflects that DNA evidence obtained from the victim's vaginal swab was also admitted and implicated Petitioner as her attacker. Additionally, as indicated above, there was abundant evidence presented at trial that Petitioner committed the offenses for which he was convicted. Having reviewed this claim de novo, Petitioner has failed to show that Alabama Court of Criminal Appeals' analysis of the trial court's admission of the DNA evidence from the victim's skirt was inherently incorrect or violative of due process. Therefore, Packer is not entitled to habeas relief on the basis of this claim.

**CERTIFICATE OF APPEALABILITY**

A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Rather, pursuant to Rule 11(a) of the Rules Governing § 2254 Cases, "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.   Rule 11(a) of the Rules Governing 2254 Cases. "A [COA] may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing, petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Tennard v. Dretke, 542 U.S. 274, 282, 124 S. Ct. 2562, 159 L. Ed. 2d 384 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484, 120 S. Ct. 1595, 146 L. Ed. 2d 542 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" Miller-El v. Cockrell, 537 U.S. 322, 336, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4, 103 S. Ct. 3383, 77 L. Ed. 2d 1090 (1983)). Based upon a careful review of the record in this case, the undersigned opines that Petitioner has not made the requisite showing. Thus, he is not entitled to a certificate of appealability.

## CONCLUSION

Based on the foregoing, the undersigned Magistrate Judge is of the opinion that Petitioner's rights were not violated and that his request for habeas corpus relief should be denied.  It is so recommended.[17]

The attached sheet contains important information regarding objections to the report and recommendation of the Magistrate Judge.

DONE this **12th** day of **March, 2010.**

        /s/ SONJA F. BIVINS
**UNITED STATES MAGISTRATE JUDGE**

---

[17]In light of the instant Report and Recommendation, Packer's Motion for Evidentiary Hearing (Doc. 23), and Motion to Remand (Doc. 24) are **DENIED**.  Additionally, Packer's Motion to Expand the Record (Doc. 22) is **DENIED** because the documents referenced in his motion are already a part of the record. (See Doc. 20, Exs. A, F).

**MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS**

**AND RESPONSIBILITIES FOLLOWING RECOMMENDATION**

**AND FINDINGS CONCERNING NEED FOR TRANSCRIPT**

1.   **Objection**.  Any party who objects to this recommendation or anything in it must, within fourteen days of the date of service of this document, file specific written objections with the clerk of court.  Failure to do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge.  See 28 U.S.C. § 636(b)(1)(c); Lewis v. Smith, 855 F.2d 736, 738 (11th Cir. 1988).  The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides, in part, that:

A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten days after being served with a copy of the recommendation, unless a different time is established by order.  The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.  The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.  It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.  Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.   **Opposing party's response to the objection.**  Any opposing party may submit a brief opposing the objection within fourteen (14) days of being served with a copy of the statement of objection.  Fed. R. Civ. P. 72; SD ALA LR 72.4(b).

3.    **Transcript (applicable where proceedings tape recorded)**.
Pursuant to 28 U.S.C. § 1915 and Fed. R. Civ. P. 72(b), the
magistrate judge finds that the tapes and original records in
this action are adequate for purposes of review.   Any party
planning to object to this recommendation, but unable to pay the
fee for a transcript, is advised that a judicial determination
that transcription is necessary is required before the United
States will pay the cost of the transcript.